UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| CATRINA BRAGG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:19 CV 209 |
| | ) |
| MUNSTER MEDICAL RESEARCH | ) |
| FOUNDATION INC., | ) |
| | ) |
| Defendant. | ) |

**OPINION and ORDER**

This matter is before the court on defendant's motion for summary judgment. (DE # 34.) For the reasons that follow, defendant's motion will be granted.

**I.  BACKGROUND**[1]

Plaintiff Catrina Bragg, an African American Registered Nurse, commenced employment with defendant Munster Medical Research Foundation d/b/a Community Hospital ("Community Hospital"), on September 10, 2018, and was separated from defendant's employment on December 12, 2018. (DE # 36-3 at 91.) Bragg filed the present suit following her termination, alleging discrimination on the basis of race and retaliation for engaging in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (DE # 1 at 1.)

Bragg was a newly-licensed nurse with no prior healthcare experience when she began at Community Hospital. (DE # 36-3 at 91.) As a condition of her employment,

---

[1] The following facts are undisputed or, where disputed, are taken in the light most favorable to plaintiff.

Bragg had to successfully complete a 90-day orientation. (*Id.* at 90.) At Community Hospital, experienced nurses serve as an orientee's preceptor, and provide guidance, direction, and instruction to the orientees. (*Id.* at 90-91.) As part of orientation, preceptors prepare progress forms evaluating and scoring the progress of orientees. (*See* DE # 36-3 at 24-31.)

During her orientation, Bragg had three preceptors: Erin Wysocki, Brittany Arrigo, and Kim Raddatz. (*Id.* at 91.) Her first preceptor was Wysocki. (DE # 43-1 at 1.) Bragg's preceptors chose which patients to assign her. (*Id.*) During Bragg's first five days seeing patients she noticed that the two patients assigned to her were of minority races, whereas the patients assigned to Wysocki were white. (DE # 43-1 at 2; DE # 36-2 at 101-103.) When Bragg was assigned to a white patient, Wysocki removed that patient from Bragg's care without explanation. (DE # 43-1 at 2.) Bragg told Wysocki that she was capable of caring for patients of all races. (*Id.*) Within a day of this incident, Wysocki became irate and shouted at Bragg after an IV became disconnected from a patient. (*Id.*) Bragg informed Dan Heredia, an educator for Community Hospital, about Wysocki's reaction to the IV incident and about Wysocki only assigning her minority patients. (*Id.* at 4.) Samantha Kranz, the Nurse Manager, assigned Bragg a new preceptor, Brittany Arrigo. (*Id.*) Under Arrigo's preceptorship, Bragg was no longer exclusively assigned to patients of minority races. (DE # 36-2 at 102.)

While Arrigo was her preceptor, Bragg heard Arrigo say that an African American patient "had an amputated arm, but she's so cute, it looks like a stick"

2

because the patient's arm was "skinny and brown." (DE # 43-1 at 4; DE # 36-3 at 74.) Bragg told Arrigo that her statement was not funny and Arrigo stopped laughing. (DE # 43-1 at 4.) There were also several occasions on which Arrigo changed the music playing from Britney Spears or country music, to rap or hip-hop, when Bragg came up to the nurse's station. (DE # 36-3 at 57.) Bragg claims that she expressed her disdain for this practice by frowning when it happened. (*Id.*)

Bragg's third and final preceptor was Kim Raddatz. (DE # 43-1 at 5.) According to Bragg, Raddatz took copious notes of Bragg's performance, telling Bragg that she was creating "legal records." (*Id.*) Bragg told Raddatz that she knew Raddatz was trying to get her fired. (*Id.* at 6.)

According to Bragg, she prevented a medication error after she discovered a computer-generated calculation error, but Raddatz later reported on her progress report that she had committed a medication error. (*Id.* at 6.) Bragg told Kranz that Raddatz was lying about her performance, but Kranz did not believe her and screamed at her. (*Id.* at 7.)

Bragg also claims that Raddatz would do disruptive things to distract or intimidate her, such as standing very close when Bragg was tending to a patient, or clapping her hands or stomping her feet. (DE # 36-3 at 61-62.) She would also "disappear" when it was time for Bragg to administer medicine – something Bragg was not authorized to do on her own – and later Raddatz would counsel Bragg on time management. (*Id.*)

3

On the day her employment was terminated, Bragg observed an incident in which an IV tube became caught around the neck of an African American patient and Raddatz stated, "whoops, let's not having a hanging tonight!" (*Id.* at 61.) Bragg claims that she replied, disgustedly, "I can't believe what I just heard." (*Id.*)

During the course of her orientation, Bragg's preceptors submitted written evaluations and held meetings to discuss Bragg's progress and performance. (*See id.* at 24-48.) On October 1, 2018, Wysocki submitted an evaluation scoring Bragg's performance 12 out of a possible 25 points, and noting that Bragg should improve her comfort with IVs, should begin giving reports to the oncoming nurse, and should improve her organization with the report sheet. (*Id.* at 24.) At the bi-weekly progress meeting, Wysocki noted that Bragg needed to work on time management, and needed to work on managing IV tubing, and primary and secondary infusions. (*Id.* at 33.)

On October 22, 2018, Arrigo scored Bragg's performance 14 out of 25, and noted that Bragg should utilize a to-do list so that no medications and dressing changes get forgotten, and she should become more comfortable with IVs and begin to develop more autonomy, requiring less prompting with patient care. (*Id.* at 26.) During the bi-weekly progress meeting, it was noted that Bragg should continue to try to improve time-management and medication administration. (*Id.* at 35.)

On November 1, 2018, during the bi-weekly progress meeting, Bragg, Arrigo, Kranz, and Heredia acknowledged that Bragg had not completed tasks typical for that point in her orientation. (*Id.* at 37.) They also discussed concerns with Bragg's comfort

4

with military time, recognizing critical potassium levels with appropriate interventions, IV Lasix administration standards, and comfort with insulin administration. (*Id.*) Everyone agreed that Bragg should have weekly, as opposed to bi-weekly, evaluations going forward, to ensure that goals are clear and being met. (*Id.*)

On November 9, 2018, during her weekly meeting, it was noted that Bragg's performance and progress was below expectation for that stage of orientation, and there were concerns about her application of knowledge and patient safety, including a medication error where a patient was given the wrong dose of medication. (*Id.* at 39.) Additionally, Arrigo reported that Bragg told a patient that the drug Toradol was addictive, and that Bragg later incorrectly said that Toradol was an antihistamine. (DE # 36-2 at 45; DE # 36-3 at 39.) Bragg claims that she was merely restating what the patient said. (DE # 36-2 at 45.) Arrigo also reported that Bragg had a problem understanding the appropriate dosages for Fentanyl. (DE # 36-3 at 39.) Bragg disputes that she made this mistake. (DE # 43-1 at 5.)

On November 15, 2018, during her weekly progress meeting, it was noted that Bragg was unable to identify what the caution symbol on the IV pump meant, and failed to realize that the flush bag on an IV pump had expired. (*Id.* at 41.)

On November 26, 2018, Raddatz scored Bragg's performance 12 out of 25, and noted that Bragg should do more admissions, discharges, patient teaching, learn doctors' names, and communicate correct information. (*Id.* at 28.) Raddatz expressed concern that Bragg was not ready to end orientation, and that Bragg required

5

substantially more orientation. She noted that while Bragg had made many improvements, she needed to develop her critical thinking skills to anticipate patient needs, without so much prompting. (*Id.* at 29.) At a progress meeting the same day, it was noted that Bragg's evaluation scores were low for what would be expected at that point in Bragg's orientation, and that significant improvements must be made prior to the next meeting. (*Id.* at 44.)

On December 9, 2018, Raddatz scored Bragg's performance 12 out of 25, and noted that while there had been slight growth, she still forgot to do tasks without prompting. (*Id.* at 31.) A score of 12 out of 25 is considered an extremely low score for that stage in orientation. (*Id.* at 129.)

On December 12, 2018, Kranz and Carla Meyer, the Director of Nursing, terminated Bragg's employment with Community Hospital. (DE # 43-1 at 8.) According to Kranz and Meyer, based on the information they received from Bragg's preceptors and their own personal observations, Bragg failed to progress through her orientation and her performance remained deficient. (*Id.* at 131-132, 140-141.) Kranz and Meyer found that Bragg was very slow to learn proper procedures, had difficulty serving multiple patients, and demonstrated poor time management and poor critical thinking skills. (*Id.*) Thus, they determined that Bragg should not move forward as a staff member in the unit. (*Id.*) Bragg was told that she would be transferred to a skilled nursing facility. (*Id.*) The job to which she was transferred was a less desirable position and paid less. (*Id.*; DE # 43-3 at 3.)

6

Community Hospital now moves for summary judgment on both of Bragg's claims. (DE # 34.) This matter is fully briefed and is ripe for ruling.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In responding to a motion for summary judgment, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50. In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the

non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

## III. ANALYSIS

### A. Race Discrimination

At the summary judgment phase in a Title VII action, the court must determine whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race (or other proscribed factor) caused an adverse employment action.[2] *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). The burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), may assist a plaintiff in convincing a court that the evidence permits such a conclusion. *David*, 846 F.3d at 224. This framework may be useful as "a means of organizing,

---

[2] Typically, a plaintiff must establish discriminatory intent on the part of the decision-maker. However, in this case, Bragg is proceeding on a cat's paw theory. (DE # 42 at 11.) "This theory applies when a biased supervisor who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021) (internal citation and quotation marks omitted). To establish race discrimination under a cat's paw theory, "the plaintiff must present evidence that the biased subordinate actually harbored discriminatory animus against him and that the subordinate's scheme proximately caused the adverse employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (internal citation and quotation marks omitted). Here, Bragg argues that Wysocki, Arrigo, and Raddatz used their progress reports to Kranz and Meyer to dupe Kranz and Meyer into terminating Bragg's employment. As discussed more fully in this section, Bragg cannot prevail on her discrimination claim – even under a cat's paw theory – because she has failed to identify sufficient evidence of discriminatory animus, either on the part of Wysocki, Arrigo, and Raddatz, or on the part of Kranz and Meyer. Moreover, she has failed to establish that her preceptors' scheme proximately caused her termination.

presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Id.* However, the *McDonnell Douglas* analysis is "not the only way to assess circumstantial evidence of discrimination." *Id.* The court must ultimately be guided by the test articulated in *Oritz*, and determine whether "the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination[.]" *Id; see also Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018).

In this case, Bragg has organized her argument based on the *McDonnell Douglas* framework, and therefore the court will begin assessing the evidence utilizing that construct. To establish a prima facie case under *McDonnell Douglas*, Bragg must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her position and performed reasonably on the job in accordance with her employer's legitimate expectations; (3) she was subject to an adverse employment action despite her reasonable performance; and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894–95 (7th Cir. 2018). "An employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007).

9

If there is sufficient evidence from which a jury could find a prima facie case of discrimination, the burden shifts to Community Hospital to produce evidence of a legitimate, nondiscriminatory reason for terminating Bragg's employment. *See Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389 (7th Cir. 2020). If Community Hospital produces such a reason, the burden shifts back to Bragg, to produce evidence that defendant's proffered reason was pretextual. *See id.* Pretext "is not just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Id.* (cleaned up). "Because the prima facie and pretext inquiry often overlap, if a defendant offers a nondiscriminatory reason for its actions, we can proceed directly to the pretext inquiry." *Id.* The court will do so here.

Community Hospital put forth a legitimate, nondiscriminatory reason for terminating Bragg's employment: Bragg failed to make sufficient progress during her orientation period to be qualified for a permanent position. (DE # 36-3 at 92, 129.) Even without considering the few incidents in her progress reports that Bragg disputes, Community Hospital has put forth robust evidence that Bragg was not meeting the legitimate expectations of her employer. The brunt of the evidence – her progress reports and notes from weekly progress meetings – shows that Bragg's performance consistently fell below Community Hospital's expectations. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021). Her preceptors, Educator Heredia, Kranz, and Meyer continuously expressed concerns regarding Bragg's lack of progress, poor time management, lack of knowledge, and mistakes.

10

Bragg's race discrimination claim fails under the *McDonell Douglas* framework because she has not established that the reasons provided by Community Hospital were mere pretext for discrimination. Bragg has not raised a genuine dispute of material fact concerning her failure to meet Community Hospital's legitimate expectations. The question is not whether Community Hospital's reasons for terminating Bragg's employment were right – the question is whether those reasons were honest. *See Igasaki*, 988 F.3d at 958.

Bragg points to specific acts or comments by Wysocki, Arrigo, and Raddatz as evidence of dishonesty. (DE # 42 at 11.) Yet, this evidence falls short of creating a question of fact regarding racial animus. Bragg's evidence that Arrigo played explicit rap music when she was at the nurse's station and stated that an African American's arm looked like a stick, is insufficient to create an inference of racial animus directed toward Bragg. The same is true of Raddatz's comment, "let's not have a hanging tonight," when an IV tube became wrapped around an African American patient's neck. These statements may be racially insensitive or even offensive, but they are not sufficient to demonstrate that Arrigo and Raddatz acted with discriminatory intent in evaluating Bragg's performance. "Remarks can raise an inference of discrimination when they are (1) made by the decision-maker, (2) around the time of the decision, and (3) in reference to the adverse employment action. When considering whether a remark is discriminatory, we also consider the context in which the remark was made." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016) (internal citation

11

and quotation marks omitted); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision."). Here, Arrigo and Raddatz's remarks cannot be connected to the adverse employment action – the remarks were not made in reference to Bragg. Neither of these comments would allow a juror to reasonably infer discriminatory intent.

Bragg's claim that Wysocki race-matched her to patients presents a marginally more compelling case for an inference of racial animus. However, the fact that during a five-day period Bragg's two patients were of minority races, while her preceptor's patients were white, is simply not sufficient, in the face of Bragg's performance reviews and the undisputed problems in her performance, to raise a question of fact regarding pretext or the ultimate question of discriminatory intent.

Bragg argues that inaccuracies in Arrigo and Raddatz's reports are evidence of pretext. (DE # 42 at 11.) She also claims that she was held to unreasonably stringent standards on account of her race, and this is further evidence of pretext. Yet, the evidence does not support an inference that Arrigo and Raddatz's reports or low progress scores were motivated by Bragg's race. Harsh, unfair, or inappropriate acts alone are not sufficient to proceed to trial on a discrimination claim. *See e.g. Igasaki*, 988 F.3d at 958. Here, there is no evidence supporting a reasonable inference that the preceptors' treatment of Bragg was linked to Bragg's race. Relatedly, there is no evidence that her preceptors' alleged racial animus proximately caused Bragg's

termination. Bragg has provided little more than her own suspicions that the reasons stated for her termination were not genuinely believed by defendant's employees, and instead were part of a scheme to dupe Meyer and Kranz into firing her. Bragg's own suspicions are not good enough to survive summary judgment. *See Uhl v. Zalk Josephs Fabricators, Inc.,* 121 F.3d 1133, 1137 (7th Cir. 1997) ("Facts, not an employee's perceptions and feelings, are required to support a discrimination claim.").

Even if this court sets aside the *McDonnell Douglas* paradigm, and assesses the evidence holistically, it is clear that a reasonable jury could not conclude that Bragg's discharge from Community Hospital was motivated by her race. Accordingly, defendant is entitled to summary judgment on this claim.

  B.  *Retaliation*

Next, the court considers Bragg's retaliation claim. Title VII forbids employers from retaliating against employees for engaging in statutorily protected activities by opposing an unlawful employment practice or participating in the investigation of one. 42 U.S.C. § 2000e–3(a); *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018). There are two ways a plaintiff may prove a prima facie retaliation claim. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). "A plaintiff opting for the 'direct' method must present evidence that (1) she engaged in a protected activity, (2) she suffered an adverse action, and (3) a causal connection exists between the two." *Swyear*, 911 F.3d at 885. "For the first element—a statutorily protected activity—[t]he plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief

13

must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Logan v. City of Chicago*, 4 F.4th 529, 538 (7th Cir. 2021) (internal citation and quotation marks omitted).

Alternatively, a plaintiff may choose the "indirect method." *Id.* This method "allows the plaintiff to establish a prima facie case without establishing a causal link." *Id.* "This method requires a plaintiff show (1) she engaged in a protected activity, (2) she performed her job duties according to her employer's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated employees who did not engage in the protected activity." *Id.* "The indirect method falls under the auspices of the *McDonnell Douglas* burden-shifting framework discussed above.

Regardless of which method a plaintiff chooses, the court must ultimately consider the evidence as a whole to determine whether the evidence would permit a reasonable factfinder to conclude that retaliatory motive caused the discharge or other adverse employment action.[3] *Igasaki*, 988 F.3d at 959.

In this case, Bragg has opted for the direct method. Bragg claims that she engaged in the following protected activity: she complained about Wysocki assigning her patients on the basis of race; she expressed non-verbal disapproval of Arrigo's comment about a patient's arm and about Arrigo playing rap music in her presence;

---

[3] A cat's paw theory of liability may also apply to a retaliation claim. *Miller v. Polaris Lab'ys, LLC*, 797 F.3d 486, 492 (7th Cir. 2015). As with her discrimination claim, Bragg asserts such a theory with regard to her retaliation claim.

and she spoke out disapprovingly when Raddatz made a lynching joke. (DE # 42 at 13.) She argues that as a result of her protected activity, she received negative performance evaluations and was terminated. (*Id.*) Bragg argues, "[a] reasonable jury could find Ms. Bragg's preceptors made it their life's work to get Ms. Bragg fired when she called out Ms. Wysocki for assigning Ms. Bragg only minority patients." (*Id.* at 14.) This court disagrees. No reasonable jury could find that Bragg's negative evaluations were precipitated by a desire to retaliate for Bragg's complaint that she was assigned to only minority patients – not when Bragg herself does not contest the majority of the critiques in her performance evaluations. Bragg has failed to establish any causal connection between her complaints and her termination.

Bragg's retaliation claim also fails when this court considers the evidence as a whole under the *Ortiz* standard. Bragg's retaliation claim rests solely on speculation. No reasonable jury could conclude that a retaliatory motive caused Bragg's termination. Accordingly, defendant is entitled to summary judgment on this claim.

## IV. CONCLUSION

Defendant's motion for summary judgment (DE # 34) is **GRANTED.** The court directs the Clerk to **ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendant Munster Medical Research Foundation Inc *doing business as* Community Hospital, and against plaintiff Catrina Bragg, who shall take nothing by way of the complaint.

**SO ORDERED.**

Date: September 17, 2021

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT